UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH LEE JONES, | Case No. 16-cv-03627-JD |
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |
| M. E. SPEARMAN, | |
| Respondent. | |

Jeremiah Lee Jones, a state prisoner proceeding pro se, has brought a habeas petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer and petitioner filed a traverse. The petition is denied.

## BACKGROUND

After a jury trial, petitioner was convicted of kidnapping for sexual purposes; aggravated sexual assault on a child under age 14 by sodomy; two counts of aggravated sexual assault on a child under age 14 by oral copulation; aggravated sexual assault on a child under age 14 by penetration of a foreign object; and four counts of forcible lewd acts on a child. *People v. Jones*, No. A138853, 2015 WL 1739626, at *3 (Cal. Ct. App. April 15, 2015). The jury found true the allegation that petitioner kidnapped the victim in connection with several counts. *Id*. Petitioner was sentenced to four consecutive terms of life in prison without the possibility of parole. Answer, Ex. 1 at 856-58. Petitioner appealed, and the California Court of Appeal affirmed the judgment. *Jones* at *1. The California Supreme Court denied review. Ex. 9.

United States District Court
Northern District of California

# STATEMENT OF FACTS

The California Court of Appeal summarized the facts as follows:

### The Incident

In February 2011, then 13-year-old Doe lived with his father and his father's roommate. Doe was about 5'2" and weighed 100 pounds. At 9:30 p.m., Doe was skateboarding in the street in front of the house. A man—later identified as Jones—ran up to Doe and asked him where his parents were. Doe responded and Jones asked: "What are you doing out here[?] People are sometimes shooting around here[.]" Jones was standing "really close" to Doe and had money "bunched up" in his hand. Jones handed Doe the money, but then took it back and pulled Doe into the bushes. Jones weighed 75 pounds more than Doe and was approximately six inches taller.

Jones ordered Doe to take off his pants and lie on his back, threatening to hurt Doe if he did not comply. Doe pushed his pants and underwear down to his ankles. Then Jones removed his pants, crawled on top of Doe, and put his mouth on Doe's penis. Jones sucked on Doe's penis for one to two minutes. Next, Jones put his penis in Doe's face and instructed him to put it "all the way in [.]" He threatened: "Do it before I hurt you." Doe complied because he was afraid Jones would hurt or kill him. Jones grabbed Doe by the hair and moved Doe's head up and down. Doe felt like he was choking and thought he might throw up. Jones flipped Doe over, onto his stomach. Jones spit on his hand and on Doe's rectum and penetrated Doe's anus with his penis three or four times. Doe repeatedly said "ouch" but Jones refused to stop. Jones also put his finger in Doe's anus and ordered Doe to say, "'Daddy, I like it.'" Doe did not yell because he was afraid Jones might kill him.

When he did not see Doe in front of the house, Doe's father became concerned and went outside to look for Doe. As he walked past shrubbery adjacent to a nearby building, he saw Jones pinning Doe down with his left arm. Doe was on his hands and knees and his pants were pulled down. Doe was "hysterical." Jones was holding his penis in his right hand, shaking it "[r]ight behind" Doe. Jones was not wearing a shirt and his pants were around his ankles. Doe's father attacked Jones. Doe ran inside the house. On the verge of crying, Doe told his father's roommate "someone had tried to rape him" and the roommate called 911.

Richmond police officers arrived and arrested Jones. He was not wearing a shirt, his pants were around his ankles, and he had $73. Doe looked like he had been crying. His clothes were "soiled" and had "debris, shrubbery, dirt on them." Crying, Doe told a police officer Jones had raped him and described the incident. When the officer asked Doe to sit in the back of the patrol car, Doe said he could not "sit down because his anus hurt."

Doe told a Sexual Assault Response Team (SART) nurse what happened. The nurse performed a SART examination and concluded Doe's injuries were consistent with his description of the incident. Child abuse pediatrician James B.

Carpenter, M.D., reviewed photographs of Doe's SART examination. Dr. Carpenter "observed a number of severe anal injuries" and explained, "I have been doing this for 32 years. They were the worst anal injuries that I have seen." The injuries "included a dramatic huge, gaping laceration" in Doe's rectal area, several smaller lacerations, and extensive bruising, all of which were "consistent with penetration trauma." According to Dr. Carpenter, Doe's injuries suggested "the nature of the condition was forceful, penetrative and definitely induced pain," and that the incident was not "consensual or desired[.]" As Dr. Carpenter explained, "[m]inor injuries can happen with consensual anal intercourse" but "they tend to be in the form of little redness[.]" Dr. Carpenter testified the injuries made it "very clear that the anus was constricted against any attempted penetration."

### Prior Sexual Batteries

In 2000, Jones was 13 and attended middle school with T.B., B.C., and S.S. Jones tried to grab T.B.'s breasts, prompting her to push his hand away and say "'No. No.'" Jones reached inside T.B.'s pants, put his hands inside her underwear, and rubbed her butt multiple times. Jones also came up behind T.B., grabbed her shoulders, and simulated having sex with her. Finally, Jones told her he was "going to rape her." T.B. tried to handle the situation by saying "no" and pushing Jones away, but she eventually reported the abuse to her school's police officer because Jones refused to stop his "aggressive" behavior. The school's police officer took statements from T.B., B.C., and S.S. T.B. saw Jones try to grab B.C.'s breast area. She also saw Jones push S.S. up against a wall and tell her, "'I'm going to kill you if you tell on me. I'm going to beat your ass.'"

### Defense Evidence

Dr. Angela Rosas, M.D., "a pediatrician specializing in child abuse and neglect" testified as an expert on conducting and interpreting SART exams. She testified SART examination medical findings "do not indicate whether [a sexual act] was consensual or whether it was forcible sexual assault." Dr. Rosas conceded, however, that Doe's injuries were consistent with his description of the incident. Jones testified the sexual acts were consensual. On the day of the incident, Jones asked Doe: "Where your parents at? . . . . [¶] You should be careful people could be shooting around here." Doe replied, "I'm good. I'm grown. I could do what I want to do." Jones pulled out "[w]ell over a hundred dollars" from his pocket, "peeled off some bills[,]" and asked Doe, "How grown are you?" Doe looked at the money and shook his head. Jones offered more money, which Doe accepted. Jones suggested he and Doe go toward a nearby building and extended his hand toward Doe. Doe grabbed Jones's hand and they walked there together. Jones put his mouth on Doe's penis, attempted three or four times to penetrate Doe's anus with his penis, and inserted his finger into Doe's anus. Doe also put his penis in Jones's mouth. Jones believed Doe willingly engaged in these sexual acts.

Jones admitted threatening T.P., his then girlfriend, in 2007. He also admitted resisting a police officer and giving false information to a police officer in 2008. In addition, Jones admitted grabbing T.B.'s breasts, groping her, gyrating his hips behind her in a sexual way, putting his hand in her pants, and telling her he was

3

"going to rape her[.]" Finally, Jones admitted doing "similar things" with B.C. On cross-examination, Jones admitted he was angry at T.P. because she would not let him into her house, and conceded he threatened to kill her and throw her out the window if she did not open the door. He denied kicking down T.P.'s front door.

**Rebuttal**

T.P. testified about the 2007 argument. She tried to keep Jones out of her apartment by blocking the front door with a couch. Jones, however, forced his way in and damaged the door. T.P. went into an interior room and closed the door, but Jones punched the door "continuously[,]" leaving a "big gaping hole." Richmond Police Officer Eduardo Soto testified regarding the circumstances underlying Jones's 2008 arrest. Jones gave police officers a fake name, refused to comply with their requests, and "flailed his arms with his elbows up[,] striking [Officer Soto] in the face" and bloodying his nose. Jones struck Officer Soto in the chest with his elbows, and kicked him.

*Jones* at *1-3.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply

4

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under §2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In this case the Court looks to the opinion from the California Court of Appeal.

As grounds for federal habeas relief, petitioner alleges that: (1) the trial court improperly admitted prior incidents of sexual battery; (2) there was purposeful discrimination in the jury selection; (3) the trial court improperly admitted rebuttal testimony; (4) there was prosecutorial misconduct at closing arguments; and (5) there was cumulative error.

## IMPROPER ADMISSION OF EVIDENCE

Petitioner alleges two instances of improper admission of evidence. Claim one asserts that the trial court improperly admitted prior incidents of sexual battery. Claim three involves the improper admission of rebuttal testimony. The Court addresses the two claims together.

### Legal Standard

The admission of evidence is an issue of state law. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "Simple errors of state law do not warrant federal habeas relief." *Id.* Accordingly, the decision of a state trial court to admit evidence "is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated

1    many times that 'federal habeas corpus relief does not lie for errors of state law.'") (citing *Lewis v.*

2    *Jeffers*, 497 U.S. 764, 780 (1990)). When a petitioner alleges that a state trial court's decision to

3    admit evidence was improper, the only question before a federal habeas court is whether an

4    erroneous admission "rendered the trial fundamentally unfair in violation of due process." *Holley*,

5    568 F.3d at 1101 (quoting *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)). However, under

6    AEDPA, "even clearly erroneous admissions of evidence that render a trial fundamentally unfair

7    may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established

8    Federal law,' as laid out by the Supreme court." *Id*.

9    Where the Supreme Court has not made a clear ruling upon an issue, circuit courts may not

10    use their own precedent to find a state court ruling unreasonable. *Id.* (citing *Carey v. Musladin*,

11    549 U.S. 70, 77 (2006)). *See also Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (per curiam)

12    ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the

13    Supreme Court.'") (quoting § 2254(d)(1)). Absent clearly established federal law, a habeas court

14    cannot conclude that a state court's ruling was contrary to or an unreasonable application of

15    clearly established federal law, and is therefore "without power to issue the writ." *Holley*, 568

16    F.3d at 1101.

17    **Discussion**

18    **Prior Incidents of Sexual Battery**

19    Petitioner contends that the trial court erred in admitting evidence of his prior sexual

20    batteries, asserting that because the evidence was different in kind from the offense charged and

21    more than a decade old, its probative value was outweighed by its prejudicial effect.

22    The United States Supreme Court "has not yet made a clear ruling that admission of

23    irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

24    issuance of the writ." *Id.* The Court has also left open the question of whether admission of

25    propensity evidence violates due process. *Estelle*, 502 U.S. at 75 n.5. Thus, whether admission of

26    prior bad acts to prove propensity violates due process has not been clearly established by the

27    Supreme Court. *See*, *e.g.*, *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008).

28

Because there is no clearly established Supreme Court authority pertaining to the erroneous admission of irrelevant, prejudicial, or propensity evidence, the state court's decision to admit the evidence of prior sexual batteries against petitioner cannot be considered an unreasonable application of clearly established federal law.

In addition, there was no error in admitting the evidence. The Ninth Circuit has held that federal habeas relief is available only when "the admission of evidence rendered the trial so fundamentally unfair as to violate due process." *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998). Due process is violated in this respect "[o]nly if there are *no* permissible inferences the jury may draw from the evidence[.]" *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis in original).

The evidence at issue against petitioner showed that when he was thirteen and in middle school, he attempted to grab a female schoolmate's breasts, reached inside her pants and put his hands inside her underwear, grabbed her by the shoulders and simulated having sex with her, and told her he was going to rape her. He also tried to grab another female schoolmate's breasts and pushed a third against a wall, telling her he would kill her and beat her if she told on him. Answer, Ex. 3 Vol. 2 at 388-95. The California Court of Appeal concluded that the trial court did not err by admitting this evidence:

> The prior sex offenses were similar: the victims were the same age and the incidents involved Jones touching the victim's private areas, including their buttocks, against their will. Jones also threatened all three victims. That the prior sex offenses took place in a different setting and against victims of a different gender does not demonstrate the court's ruling was an abuse of discretion. As our high court has explained, similarity is a relevant—but not dispositive—factor under [California Evidence Code] section 1108.
>
> We are not persuaded by Jones's claim that the prior sexual batteries were too remote. No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible. [S]ubstantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses. We conclude 11 years not too remote. Numerous cases have upheld admission pursuant to . . . section 1108 of prior sexual crimes that occurred decades before the current offenses.

*Jones* at *7 (omission in original) (citations and quotation marks omitted).

7

These batteries were committed against young children, were sexual in nature, and involved threats of violence. It was therefore permissible for the jury to infer from these incidents that petitioner had the intent to commit kidnapping for sexual purposes and sexual assault, and also that he had the propensity to commit sexual assault.

Even if a due process violation had occurred, which is not the case, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*." *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993)). Under this standard, an error requires reversal "only if it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 631 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

The California Court of Appeal found that "[t]he evidence was harmful to [petitioner], but it was not prejudicial in the sense it would confuse the jury or cause it to decide the case on an improper basis . . . . [T]he prior sexual batteries here were sufficiently similar in several respects to the charged offenses." *Jones* at *7.

Petitioner admitted committing the sexual acts upon the victim. Answer, Ex. 3 Vol. 7 at 1322-25. The prosecution introduced evidence corroborating the victim's testimony that he did not consent. The victim's father testified that he heard the victim crying and saw the victim being held down by petitioner, and that the victim was "hysterical." Ex. 3 Vol. 2 at 410-12. The medical evidence was consistent with the victim's report that the sexual acts were forcible and against his will. Ex. 3 Vol. 4 at 716-7, 722-26, 739–40; Ex. 3 Vol 5 at 867-69, 872, 876. Dr. Carpenter testified that the victim's injuries "were the worst anal injuries that I have seen" in 32 years of practice. Ex. 3 Vol. 5 at 868. Given the amount of evidence against petitioner regarding the charged offense; the fact that presentation of the evidence of prior sexual batteries consumed only about one hour amid an eight-day trial; and the relatively less inflammatory nature of the

8

prior batteries compared to the charged offenses, this Court cannot say that the prior-bad-act evidence had a substantial and injurious effect upon the jury's verdict. This claim is denied.

### Rebuttal Evidence at Trial

Petitioner contends that the trial court erred by allowing the prosecution to introduce testimony in rebuttal to petitioner's trial testimony. He asserts that the prosecutor misused the occasion to introduce evidence that went far beyond the scope of petitioner's testimony, and that it was prejudicial to the extent that the incidents described were inflammatory and unrelated to the charged offenses.

As discussed, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101. Thus, the state court's ruling cannot be an unreasonable application of clearly established Supreme Court law. *Id.* Petitioner points to no Supreme Court authority which clearly establishes that offering admissible evidence on rebuttal violates due process. Because there is no clearly established Supreme Court authority pertaining to the erroneous admission of rebuttal evidence, the state court's decision to admit the rebuttal testimony cannot be considered an unreasonable application of clearly established federal law.

Even under a less exacting standard, petitioner would not be entitled to relief. According to the Ninth Circuit, admission of evidence violates due process "[o]nly if there are *no* permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920. Petitioner testified in his own defense at trial. Two aspects of the testimony were subject to the rebuttal testimony at issue: threatening his girlfriend T.P. in 2007, and resisting a police officer in 2008.

The California Court of Appeal found that the rebuttal testimony was proper.

> [Petitioner] admitted threatening T.P., but he denied kicking down her front door. This denial made evidence that [petitioner] forced his way into T.P.'s apartment and damaged her front and interior doors relevant. The same is true with respect to Officer Soto's testimony. On direct and cross-examination, Jones admitted resisting

arrest but denied fighting with or assaulting the officers and claimed he could not recall bloodying Officer Soto's nose or injuring a second police officer. Officer Soto's rebuttal testimony was "made necessary" by Jones's purported inability to recall the circumstances of the altercation.

Additionally, the rebuttal testimony was relevant to assess Jones's credibility after he denied kicking down T.P.'s door and fighting with Officer Soto and bloodying his nose.

*Jones* at *8-9 (quoting *People v. Young*, 3 Cal. App. 4th 1149, 1199 (2005) (citation omitted).

Petitioner is not entitled to relief. Petitioner admitted that he had threatened to kill his girlfriend T.P. in 2007 because she would not let him into her house, but he denied kicking down her front door. Ex. 3 Vol. 7 at 1311, 1358. T.P. testified in rebuttal that she tried to keep petitioner out of her apartment by blocking the front door with a couch that he forced his way in anyway, damaging the door in the process. Ex. 3 Vol. 8 at 1418. Petitioner's testimony implied that he had not forced his way into T.P.'s home or caused any damage. T.P.'s rebuttal testimony was permissible because it called petitioner's truthfulness into question, which is relevant to assessing his credibility. It was in turn permissible for the jury to make inferences regarding petitioner's credibility.

In addition, petitioner admitted to resisting police in 2008 but denied fighting with or assaulting the officers, claiming he could not recall bloodying one officer's nose or injuring the other. Ex. 3 Vol. 7 at 1311, 1363-64. Officer Soto testified on rebuttal that petitioner had in fact struck him in the face and chest, caused his nose to bleed, kicked him, and struck his partner in the face. Ex. 3 Vol. 8 at 1425-26. This testimony was likewise relevant in assessing petitioner's credibility.

The rebuttal testimony did not have a "substantial and injurious effect" on the jury's decision. *Brecht*, 507 U.S. at 631. The testimony was brief within the context of the entire trial, and the acts described were far less inflammatory than the offenses charged. This claim is denied.

Petitioner next contends that his rights under the Fourteenth Amendment, *Batson v. Kentucky*, 476 U.S. 79 (1986) and *People v. Wheeler*, 22 Cal. 3d 258 (1978) were violated due to the prosecution's exclusion of two African-American potential jurors.

**Legal Standard**

The use of peremptory challenges by the prosecution to exclude potential jurors solely on the basis of race is forbidden by the Equal Protection Clause of the Fourteenth Amendment. *Batson*, 476 U.S. at 89. *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process. First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id*. at 94. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, at the third step, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id*. at 93-98.

In evaluating the race-neutral explanation, the reviewing court must keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. *See Rice v. Collins*, 546 U.S. 333, 340-41 (2006). Because determinations of credibility and demeanor of the prosecutor and jurors lie "peculiarly within the trial judge's province," the trial court's ruling on the issue of discriminatory intent is entitled to deference and must be sustained unless clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 476-82 (2008) (quoting *Henderson v. New York*, 500 U.S. 352, 365 (1991)).

A federal habeas court can only grant habeas relief "if it was unreasonable [for the trial court] to credit the prosecutor's race-neutral explanations for the *Batson* challenge," *Rice*, 546 U.S. at 338, *and* if "the state appellate court was objectively unreasonable in concluding that a trial

court's credibility determination was supported by substantial evidence." *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013) (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)).

**Background**

Petitioner claims that potential jurors Mr. H and Ms. E were struck from the jury panel solely on account of their race. During jury selection, petitioner's trial counsel brought a timely *Batson/Wheeler* challenge to each of the prosecution's peremptory challenges to Mr. H and Ms. E. The trial court denied petitioner's challenges and the California Court of Appeal upheld the trial court's decision, finding substantial evidence to support the denial of petitioner's challenge.[1] In the instant petition, petitioner asserts that the prosecution's proffered race-neutral justifications for excluding the two potential jurors were mere pretext for discriminatory intent.

The Court notes that the *Wheeler* motion procedure previously used by California courts does not satisfy the constitutional requirement laid down in the first step of *Batson*. *See Johnson v. California*, 545 U.S. 162, 168 (2005); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000). The Supreme Court of the United States has made clear that "California's 'more likely than not' standard is at odds with the prima facie inquiry mandated by *Batson*." *Johnson v. California*, 545 U.S. at 173. To satisfy *Batson*'s first step, a defendant need not persuade the judge that the challenge was more likely than not the product of purposeful discrimination; rather, he need only produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. *Id.* at 171. Accordingly, federal habeas courts should continue to apply *Wade*'s de novo review requirement whenever state courts use the "strong likelihood"/"more likely than not" standard. *See Johnson v. Finn*, 665 F.3d 1063, 1068–69 (9th Cir. 2011). If the state court used the

---

[1] The California Court of Appeal noted that the parties agreed that this case involved step three of the *Batson* analysis: whether the trial court properly accepted the race neutral reasons provided by the prosecutor. *Jones* at *8.

correct legal standard, its ruling on whether a criminal defendant has established a prima facie case of prosecutorial discrimination is entitled to a "presumption of correctness" on federal habeas review. *See Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).

The record in this case demonstrates that the state trial court applied the correct legal standard. Although that court never stated on the record whether it employed a "strong likelihood"/"more likely than not" or a "raise an inference" standard during the first step of the *Batson* inquiry, it did specifically note that "the *Wheeler* case is no longer good law" and recognized that "the *Johnson* case superseded it." Ex. 2 Vol. 4 at 732-32. The court proceeded on to the next steps without making an explicit ruling as to whether defense counsel had established a prima facie case of discrimination. It appears, however, that the court was aware of the conflict between state and federal standards and its statements imply that the court correctly applied the "raise an inference" standard as required by *Johnson*. The court's explicit acknowledgement that the *Johnson* standard controlled its decision demonstrates that the court used the correct standard. Accordingly, the state court decision is entitled to AEDPA deference.

### Discussion

### Prospective Juror Mr. H

Prospective Juror Mr. H "was unemployed and looking for a warehouse job . . ." "responded to most voir dire questions with one word in a quiet voice . . . " "admitted he was 'sleepy' during voir dire," and the judge found it necessary to warn him "not to 'go back to sleep' while other prospective jurors were being questioned." *Jones* at *4. The prosecutor used a peremptory challenge to excuse Mr. H, an African-American man. When asked the reasons for her challenge, the prosecutor stated:

> [M]y concern with him was that he is extremely young. He's 19 years old. He is single. He is unemployed. He is not married. In addition to being unemployed he did indicate that he worked for one month at a warehouse but currently he is still unemployed. And based on those reasons I did not think that [Mr. H] was the best fit

for this jury. I just don't think he has that much of a stake in this community.

Ex. 2 Vol. 4 at 729. The court found the prosecutor's stated race-neutral justifications to be plausible and denied the *Batson* motion.

The California Court of Appeal concluded that the trial court properly accepted the proffered race-neutral justifications. It found that Mr. H's young age and lack of employment suggested "he lacked a stake in the community," *Jones* at *5, which is an acceptable race-neutral justification. That court also undertook a comparative juror analysis to determine whether discriminatory action occurred. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). Juror No. 53, who was seated on the jury, was also single and unemployed, but the similarity ended there: Juror No. 53 was ten years older than Mr. H, was a college graduate, and performed volunteer work in the community. Juror No. 114 was young and single, but had lived in the area his entire life, had worked for a family business, and played in a band with high school friends. These characteristics suggested Juror No. 114 "had a stake in the community" which made him "a favorable juror for the prosecution." *Jones* at *5.

In the instant petition, petitioner asserts that "because the record does not contain Mr. H's questionnaire, the record does not reflect whether he shared any or all of [Juror No. 114's] characteristics." Traverse, Appendix A at 17. Petitioner then argues that "[t]he only conceivable difference . . . between Mr. H. and juror 114 is that the former was African-American and the latter was not." *Id.*

Petitioner is not entitled to habeas relief. A juror who lacks a stake in the community might be less inclined to have the community's best interests in mind when making a decision. He might also not share the community's moral standards. Additionally, youth and lack of life

experience or employment have been recognized as legitimate race-neutral justifications for striking a juror. *See Rice*, 546 U.S. at 341 (finding "wariness of the young and the rootless" to be race-neutral); *Mitleider v. Hall*, 391 F.3d 1039, 1049 (9th Cir. 2004) (finding tardiness and "limited life experience" to be permissible reasons for peremptory challenge); *Stubbs v. Gomez*, 189 F.3d 1099, 1106 (9th Cir. 1999) (finding lack of employment experience a race-neutral justification).

It is true that the record does not reveal whether Mr. H shared any other characteristics with Jurors No. 53 and 114 due to the absence of Mr. H's full juror questionnaire, and Mr. H's testimony does not disclose that information. For example, we cannot ascertain whether Mr. H was born and raised in the community or had family there, as had Juror No. 114. We cannot ascertain whether Mr. H attended college or did any volunteer work, as had Juror No. 53. It is therefore impossible to say with certainty that the similarities are insufficient. However, even if Mr. H did share all of these characteristics with the two selected jurors, Mr. H's courtroom behavior during voir dire reveals his specific lack of fitness. He gave terse responses to the prosecutor's questions and slept during voir dire. "[P]assivity, inattentiveness or inability to relate to other jurors" are all "valid, race-neutral explanations for excluding jurors." *United States v. Changco*, 1 F.3d 837, 840 (9th Cir. 1993). It was therefore reasonable for the trial court to credit the prosecutor's race-neutral justifications, and it was in turn objectively reasonable for the California Court of Appeal to conclude that the trial court's credibility determination was supported by substantial evidence.

**Prospective Juror Ms. E**

Prospective Juror Ms. E was a grandmother, had prior jury experience, and had been a special needs camp director and a board chair for a nonprofit organization. *Jones* at *4. During voir dire, the prosecutor asked most potential jurors to respond to either a "Target" or a "rain" hypothetical scenario. In the Target hypothetical, a man walks into Target with a pair of scissors

in his pocket, cuts the sensors off an electronic device, and attempts to leave. *See* Ex. 2 Vol. 3 at 507. In the rain scenario, the prosecutor asked if the juror could determine if it was raining outside based on someone coming into the courthouse and dusting off their raincoat or shaking their umbrella. Ex. 2 Vol. 3 at 513. The purpose was to engage potential jurors in a discussion on the use of circumstantial evidence; specifically, using the Target hypothetical as an example, to determine whether the potential juror could, based on the facts, infer that the man had formed the intent to steal before he entered the store. The following exchange took place during Ms. E's voir dire:

> [Prosecution]: [C]ould you determine that that individual walked into Target with the intent to steal?
>
> Ms. E: No, he didn't—not necessarily.
>
> …
>
> [Prosecution]: [B]ut how do you reconcile the scissors in the pocket?
>
> Ms. E: Because people carry scissors for different reasons . . . . [¶] There is some who carry manicure kits that contain scissors[.]

Ex. 2 Vol. 4 at 750-51. Despite extensive questioning on the subject of intent, Ms. E remained reluctant to infer that the man had formed the intent before entering the store. The prosecutor used a peremptory challenge to strike Ms. E, an African-American woman. Defense counsel made a *Batson* motion. The prosecutor explained its decision by emphasizing the role of circumstantial evidence in its case: the jury would have to infer from circumstantial evidence that petitioner had formed the intent to commit kidnapping for a sexual purpose at the time he met the victim, not at a later time.

> And so the circumstantial evidence hypothetical that I have given to jurors is extremely important in my evaluation of their ability to evaluate evidence in this specific case. And any juror that I believed that either hesitated or came up with added facts to the hypothetical, anything like that, obviously caused me concern.

Ex. 2 Vol. 5 at 1014. The prosecutor went on to explain that she chose to strike Ms. E due to Ms.

E's reluctance to infer a pre-existing intent, even when asked to consider that the man in the hypothetical had a prior theft conviction. The court found the prosecutor's justification to be plausible and race-neutral, and denied the *Batson* motion.

The California Court of Appeal upheld the trial court's decision. It found that Ms. E "appeared reluctant to use circumstantial evidence, which the prosecutor intended to offer to establish [petitioner]'s intent to commit the charged crimes." *Jones* at *5. This was a sufficiently plausible and race-neutral reason for excusing Ms. E.

Petitioner argues that the prosecutor did not ask Jurors No. 15, 35, 46, 53, and alternate Juror No. 125 the Target hypothetical. Petitioner argues, "If the hypothetical had truly been 'extremely important' to the prosecutor in evaluating prospective jurors, she would have discussed it with all, or nearly all, of the prospective jurors." Ex. 4 at 52. Therefore, the argument goes, the prosecutor's proffered race-neutral justification was pretext for discriminatory intent.

Petitioner's argument is unpersuasive. The record reveals that the prosecutor either discussed the alternative "rain" hypothetical with these jurors, or discussed circumstantial evidence with them in more general terms. When Juror No. 15 was asked whether he or she was comfortable with "circumstantial evidence and direct evidence with the rain example," the juror replied, "I'm comfortable with circumstantial evidence and direct evidence." Ex. 2 Vol. 3 at 512-513. A short time later, the prosecutor stated "[U]ltimately I want to make sure that you can apply the circumstantial evidence standard," and they continued to discuss the rain hypothetical. *Id.* The prosecutor asked Juror No. 35: "The Target example, could you determine that individual walked into Target with the intent to steal?" Juror No. 35 replied, "Yes." Ex. 2 Vol. 3 at 592. Juror No. 46 responded affirmatively when asked whether he or she was comfortable with circumstantial evidence. Ex. 2 Vol. 3 at 501. Juror No. 53 and the prosecutor briefly discussed the rain hypothetical. Ex. 2 Vol. 4 at 745-46. Alternate Juror No. 125 brought up the Target example during voir dire, and, additionally, the prosecutor asked for that juror's response to the rain hypothetical. Ex. 2 Vol. 7 at 1285-87.

Petitioner's claim that the prosecutor's stated justification was pretextual is without merit. Accordingly, the trial court reasonably credited the prosecutor's justification, and the California

1   Court of Appeal reasonably concluded that the trial court's credibility determination was

2   supported by substantial evidence.

3                                    **PROSECUTORIAL MISCONDUCT**

4       **Legal Standard**

5       Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard

6   of review is the narrow one of due process and not the broad exercise of supervisory power.

7   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated

8   when a prosecutor's misconduct during closing arguments has a substantial and injurious effect or

9   influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 637. "[T]he touchstone of due

10  process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

11  culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The federal habeas

12  court must distinguish "between ordinary trial error of a prosecutor and that sort of egregious

13  misconduct . . . amount[ing] to a denial of constitutional due process." *Donnelly v. DeChristoforo*,

14  416 U.S. 637, 647-48 (1974).

15      One factor in determining whether misconduct amounted to a violation of due process is

16  whether the trial court issued a curative instruction. When a curative instruction is issued, a court

17  presumes that the jury has disregarded inadmissible evidence and that no due process violation

18  occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 182.

19      **Discussion**

20      Petitioner contends that the prosecutor made three misstatements of fact during closing

21  arguments which resulted in federal constitutional error. Traverse at 25-28. However, in the

22  California Court of Appeal petitioner alleged five misstatements of fact. *Jones* at *9–11. Because

23  the trial court's responses to all of defense counsel's objections during closing arguments are

24  relevant to the resolution of the due process issue—particularly its instructions that attorney

25  argument is not evidence—all five alleged misstatements of fact will be addressed here.

26      Specifically, petitioner alleges the prosecutor misstated the facts regarding: (1) whether

27  petitioner had lied on the stand about causing damage to T.P.'s door; (2) whether petitioner had

28  lied on the stand about a prior assault on two police officers; (3) the number of SART

examinations Dr. Carpenter had performed; (4) how often the victim in the case showered; and (5) statements B.C. had made to a police officer about a prior threat petitioner had made to her.

The California Court of Appeal determined that in four of the five instances of alleged misstatements of fact the prosecutor did not misrepresent the record, as the prosecutor's arguments were based on reasonable inferences drawn from the evidence. It is permissible for a prosecutor to ask the jury to draw these inferences from the evidence. *See United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) ("It is certainly within the bounds of fair advocacy for a prosecutor . . . to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true."); *Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005) ("The prosecutor may argue reasonable inferences from the evidence presented, which is precisely what he did here."). Based on a review of the record in this case, the California Court of Appeal's determination was not objectively unreasonable.

**Damage to Door**

First, petitioner alleges that the prosecutor misrepresented his testimony regarding the damage caused to T.P.'s door. The prosecutor stated, "credibility is extremely important here," noting that petitioner "denied that he caused any damages to [T.P.]'s door. Again, another small lie, but it's a lie." Ex. 3 Vol. 9 at 1607-08. Petitioner's counsel objected to this as a misstatement of petitioner's testimony. The trial court overruled the objection, stating that the jury "will decide what the facts are." *Id.* The prosecutor then stated that petitioner "lied about causing damage to the front door." *Id.* Petitioner argues that the prosecutor misstated his testimony because he did not lie about damaging the door—he merely denied kicking in the door when directly asked whether he had kicked in the door. Ex. 3 Vol. 7 at 1358. Although T.P. did testify that her door had been damaged, either from "being slammed continuously" or from petitioner "forc[ing] his way in," she did not testify that petitioner had kicked in her door. Ex. 3 Vol. 8 at 1418.

The California Court of Appeal reasoned that petitioner's testimony "created the inference he had not damaged her door at all" and T.P.'s rebuttal testimony showed that petitioner "*did* damage her front and interior apartment doors." *Jones* at *10. That court concluded that the prosecutor's comments were appropriate.

It was reasonable for the California Court of Appeal to deny petitioner's prosecutorial misconduct argument with respect to these statements. Petitioner's trial testimony implied that he had not damaged T.P.'s door at all, while T.P.'s testimony directly contradicted this testimony. Petitioner's testimony may have been technically correct in that he did not literally kick the door in, but this leaves open the possibility that he damaged the door in another fashion. It was therefore reasonable for the prosecutor to ask the jury to infer that petitioner offered deliberately misleading testimony. The prosecutor's statements did not amount to misconduct, let alone the type of egregious misconduct that would rise to the level of a constitutional violation. Furthermore, the trial court's limiting instruction following the prosecutor's comment creates the presumption that the jury was able to decide for itself whether petitioner was being truthful or not.

**Prior Assault of Police Officers**

Second, petitioner asserts that the prosecutor misrepresented his testimony regarding his conduct and responsibility for the prior assault on two police officers. The prosecutor stated:

> [H]e was not being truthful on the stand . . . . He tried to minimize or downplay his assault on two police officers. He said he did not know that he gave Officer Soto an injury. [¶] You heard what happened. Officer Soto said he deliberately was throwing elbows, took off running . . . . [W]hen he arrested him, Officer Soto has a bloody nose and he's escorting the defendant to a car. There is no way [petitioner] didn't see the blood coming down off of Officer Soto's face.

Ex. 3 Vol 9 at 1608-09. Petitioner argues these statements were misleading because he "generally *did* admit to his prior conduct and accepted responsibility." Traverse at 26.

The California Court of Appeal rejected petitioner's argument on procedural and substantive grounds. First, defense counsel failed to object to the alleged misstatement. Because "'[n]othing suggest[ed] an objection would have been futile or an admonition inadequate to cure any harm,'" this failure resulted in forfeiture of the claim on appeal. *Jones* at *10 (quoting *People v. Adams*, 60 Cal. 4th 541, 569 (2014). Second, the court of appeal concluded that "[t]he prosecutor's comments were an accurate description of the evidence because [petitioner] refused to admit he fought with or assaulted the officers and testified he did not recall giving Officer Soto a bloody nose." *Id.*

20

The California Court of Appeal reasonably denied petitioner's prosecutorial misconduct claim with respect to these statements. Trial counsel's failure to object to the prosecutor's statements bars petitioner from raising this claim on appeal. "To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." *Adams*, 60 Cal. 4th at 568-69. Petitioner's claim was therefore adequately disposed of in the California Court of Appeal.

However, even considering petitioner's claim on the merits, the California Court of Appeal's decision was reasonable. Officer Soto gave testimony regarding his arrest of petitioner in 2008: "[Petitioner] was sitting at the time of his arrest and jumped up from his position on the curb and flailed his arms with his elbows up striking me in the face. [¶] My right nostril was bleeding." Ex. 3 Vol. 8 at 1425-26. After petitioner fled and Officer Soto and his partner caught him, he "was still flailing trying to throw his elbows back. He struck me in the chest a couple of times and kicked me with his legs." *Id.* Petitioner testified that he was not "trying to beat them up," was "just trying to deter him from handcuffing me," did not recall giving Officer Soto a bloody nose, and was unaware that he had done so "until the officers told me everything was done." Ex. 3 Vol 7 at 1363.

The prosecutor's argument that petitioner was not being truthful on the stand was a reasonable inference drawn from the evidence presented, despite petitioner's assertion that he had "generally" told the truth. During his testimony petitioner admitted to "engag[ing] in conduct amounting to resisting police officers," "giv[ing] false information to a police officer," and "giv[ing] a false name . . . to try to avoid detection by the police[.]" Ex. 3 Vol. 7 at 1311. Given the conflicting evidence presented by petitioner and Officer Soto, an inference that petitioner was not being entirely truthful in his testimony was reasonable. This claim is denied.

**SART Exams**

Petitioner also argues that the prosecutor misstated the testimony of expert witness Dr. Carpenter. The prosecutor stated during closing arguments that Dr. Carpenter "had experience with thousands of SART exams and he's had experience with thousands of forcible anal intercourse SART exams. He's had experience with thousands of kids through his clinical work at

juvenile hall." Ex. 3 Vol. 8 at 1510. Defense counsel objected that the prosecutor misstated the testimony in that the doctor "never testified he did thousands of exams at juvenile hall." *Id*. The trial court issued an admonition to the jury:

> Ladies and gentlemen, you will decide what the testimony was to the extent that counsel's recitation of what the evidence shows is not what you individually or collectively remember, it's your decision that count [sic]. [¶] So this is a human endeavor here. Once in a while the attorney may misrecollect the precise evidence. And if they do, it's your job to decide what the evidence was and then base your decision on that evidence, even if the human involved in the closing argument have [sic] made a mistake.

*Id*. Petitioner argued in the California Court of Appeal that "the prosecutor misstated Dr. Carpenter's testimony because Dr. Carpenter did not testify 'all' of the SART examinations 'involved forcible anal intercourse.'" *Jones* at *10. The court determined that it was "not unreasonable to infer" that the number of SART exams "involving forcible anal intercourse could have reached the thousands," given that the doctor had performed and reviewed thousands of such examinations. The court accordingly concluded there was no prosecutorial error. *Id.*

The California Court of Appeal did not unreasonably determine there was no prosecutorial error. Dr. Carpenter testified that he had been involved in conducting and interpreting SART examination results since "back in the 70s," had conducted "hundreds, if [not] thousands" of examinations, and had reviewed "thousands" more. Ex. 3 Vol. 5 at 841-43. He further testified that he "worked at a juvenile hall between 1981 and 2004 and examining [sic] teen-agers . . . every Monday for many years for all sorts of reasons." Ex. 3 Vol. 5 at 866. Given the high number of examinations Dr. Carpenter conducted or reviewed over a career spanning more than thirty years, it was reasonable to suggest to the jury that he "had experience with thousands of kids" at juvenile hall. "The prosecutor may argue reasonable inferences from the evidence presented." *Menendez*, 422 F.3d at 1037. Moreover, the court's instruction to the jury that it should decide for itself what the evidence proved creates the presumption that the jury disregarded any impermissible evidence.

**Showering**

Petitioner next argues that the prosecutor misstated evidence regarding the frequency at which the victim showered. The prosecutor stated that the victim "showered 'every other day.'"

*Jones* at *10.  Defense counsel objected that this was a misstatement of the testimony.  The Court overruled this objection and instructed the jury: "You are the ultimate fact finders here.  You get to decide whether [the prosecutor] stated the evidence or misstated the evidence or they both have misstated the evidence on the same fact."  Ex. 3 Vol 9 at 1611.  Petitioner argued that this was a misstatement because the victim "testified he showered 'most days,' not every other day."  *Jones* at *10.  The California Court of Appeal determined that "[t]he prosecutor's statement that [the victim] showered '[e]very other day' was a permissible inference from [the victim]'s testimony that he showered 'most days.'"  *Jones* at *10.

The California Court of Appeal's determination was not unreasonable.  The victim testified that he showered or bathed "most days," "[e]specially school days."  Ex. 3 Vol 3 at 637.  "Most days" could reasonably be inferred to mean every other day.  It was not error for the prosecutor to make this argument.  Additionally, the trial court's limiting instruction creates the presumption that the jury disregarded any impermissible evidence.

**Prosecutor Misstatement of Fact**

Petitioner alleges that the prosecutor improperly referred to a matter not in evidence during closing arguments when she stated that petitioner had threatened one of his classmates in junior high school.  Specifically, the prosecutor stated: "[B.C.] told the police officer when she was 13-years old, ten years ago, that the defendant threatened to basically in his language have sex with her and in the bushes on the way home from school."  Ex. 3 Vol. 8 at 1479.  Petitioner's trial counsel objected that the statement had referred to a matter not in evidence, and the court overruled the objection without issuing an instruction to the jury.  Ex. 3 Vol. 8 at 1479.

The California Court of Appeal determined that the prosecutor had in fact misstated testimony because the officer did not testify to anything B.C. may have told him.  "There was no evidence in the record about what T.B. told a police officer.  T.B. testified she saw [petitioner] trying to grab B.C.'s breast area; [petitioner] admitted he had groped T.B., told her that he was going to rape her, and had done 'similar things' to B.C.  'Counsel may not . . . state facts not in evidence or mischaracterize the evidence.'"  *Jones* at *11 (omission in original) (quoting *People v. Tafoya*, 42 Cal. 4th 147, 181 (2007)).  However, that court determined that "[t]he prosecutor's

23

misstatement of this immaterial fact . . . did not prejudice [petitioner] . . . ." *Jones* at *11. The court provided two rationales for its conclusion. First, "the evidence against Jones was overwhelming." *Jones* at *11. Second, "there [was] not a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." *Jones* at *11 (quoting *People v. Friend*, 47 Cal. 4th 1, 29 (2009)) (internal quotation marks omitted).

Petitioner asserts that this statement by the prosecutor about B.C. was improper because there was no evidence in the record about what B.C. told the officer. Although the statement by the prosecutor may have been an error, the error does not rise to the level of a constitutional violation. First, the California Court of Appeal reasonably concluded that the incident referred to by the prosecutor was immaterial. The jury did not require it to convict petitioner on the charged offenses. Second, the state court reasonably concluded that in light of the overwhelming evidence against petitioner as to the charged offense, the prosecutor's error did not prejudice him.

> [The victim] told his father's roommate, the police, the SART nurse, and the jury that [petitioner] sexually assaulted him and that he complied with [petitioner]'s demands because he was afraid [petitioner] might kill him if he did not. [The victim]'s father's testimony corroborated [the victim]'s description of the incident. Additionally, the medical evidence was consistent with [the victim]'s report of forcible sexual assault and Dr. Carpenter testified [the victim]'s injuries—'the worst anal injuries' he had seen in his 32 years of practice—were consistent with forceful and nonconsensual penetration. Finally, the defense's own expert . . . conceded [the victim]'s injuries were consistent with his description of the incident. [Petitioner]'s testimony that the sexual acts were consensual was not persuasive, particularly in light of the evidence he had threatened and sexually battered other victims.

*Jones* at *11 (footnote omitted). Sufficient evidence existed independently of the misstated fact to convict petitioner. Third, the Court instructed the jury that "nothing the attorneys said—including during closing arguments—was evidence. We presume the jury understood and followed these instructions." *Id.* (citation omitted). The California Court of Appeal reasonably concluded that "any prosecutorial error was harmless because [petitioner] would not have received a more favorable outcome absent the prosecutor's minor misstatement." *Id.*

Additionally, whether the fact was not in evidence is in itself questionable. During cross-examination by the prosecutor, petitioner generally accepted responsibility for the incident in

question. When asked, "Do you remember threatening [B.C.] when you were 13 that you were going to . . . fuck her in the bushes on the way home from school?" , petitioner responded, "I don't remember if I pled to it . . . . I accept responsibility for my actions." Ex. 3 Vol. 7 at 1355-56. Petitioner is correct that the officer never testified that B.C. had made this statement; however, petitioner did accept responsibility for threatening B.C. when asked about it, and defense counsel did not object to the question. Thus the incident arguably came in as evidence, although through petitioner's, not the officer's, testimony.

In sum, because the misstatement was immaterial, the other evidence against petitioner was overwhelming, the trial court issued a curative instruction, and the fact did come up during trial testimony, the prosecutor's alleged misstatement constitutes only ordinary trial error. It therefore does not rise to the type of error that has a substantial and injurious effect or influence in determining the jury's verdict, *Brecht* 507 U.S. at 673, and cannot be considered a denial of due process. Habeas relief is accordingly denied with respect to petitioner's claim of prosecutorial misconduct.

## CUMULATIVE ERROR

### Legal Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See, e.g., Thomas v. Hubbard*, 273 F.3d. 1164, 1180 (9th Cir. 2002). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996). Similarly, there can be no cumulative error when there has not been more than one error. *United States v. Solorio*, 669 F.3d

943, 956 (9th Cir. 2012).

**Discussion**

The California Court of Appeal, in a one-sentence footnote, rejected petitioner's cumulative error claim. *Jones* at *11 n.6. In his habeas petition, petitioner alleges that if no one error requires reversal, the cumulative effect of the errors results in a miscarriage of justice.

The California Court of Appeal reasonably denied petitioner's cumulative error claim. Having found that only one minor, non-prejudicial error occurred, the cumulative error doctrine does not apply. *Solorio*, 669 F.3d at 956. As discussed above, the government's case against petitioner was strong. *Thomas*, 273 F.3d at 1180. Habeas relief is accordingly denied with respect to this claim.

**CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated:  January 16, 2018

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEREMIAH LEE JONES,

        Plaintiff,

    v.

M. E. SPEARMAN,

        Defendant.

Case No. 16-cv-03627-JD

**CERTIFICATE OF SERVICE**

      I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

      That on January 16, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jeremiah Lee Jones ID: AP8683
High Desert State Prison
Housing A2 #123
P.O. Box 3030
Susanville, CA 96127

Dated: January 16, 2018

Susan Y. Soong
Clerk, United States District Court

By: *Lisa R. Clark*
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO